**PEPSIAMERICAS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 00–6T.

United States Court of Federal Claims.

March 20, 2002.

Steven C. Lambert, Washington, D.C., attorney of record for plaintiff. Richard F. Riley, Jr., Michael M. Conway, John B. Palmer III and Jonathan P. Biller, of counsel.

Robert Stoddart, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Eileen J. O'Connor, for defendant. Mildred L. Seidman, Chief, and David Gustafson, Assistant Chief.

## OPINION

FUTEY, Judge.

This tax refund case is before the court on the parties' cross-motions for summary judgment. Plaintiff believes it is entitled to a partial bad debt deduction for the 1990 tax year pursuant to Internal Revenue Code (IRC) § 166(a)(2). Plaintiff bases its claim on a loan that it issued to a trust managing its employee stock ownership plan (ESOP). The trust later defaulted on the loan after plaintiff terminated the ESOP. Plaintiff asserts it is entitled to a partial bad debt deduction because it satisfies all of the requirements in section 166.

Defendant contends plaintiff is precluded from claiming a partial bad debt deduction because the ESOP was solvent at the time of termination. Defendant maintains plaintiff cannot render a collectible debt uncollectible and then claim a bad debt deduction. Defendant also asserts that plaintiff is not entitled to said deduction because it voluntarily released a solvent debtor from liability for considerations that were satisfactory to itself. In addition, defendant argues plaintiff incurred no out-of-pocket loss when it transferred stock to the ESOP, and thus, it cannot claim a deduction as a matter of equity.

### Factual Background

Plaintiff, PepsiAmericas, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business in Minneapolis, Minnesota. Plaintiff is the successor of the assets and liabilities of Whitman Corporation (Whitman), pursuant to a statutory merger occurring on or about May 20, 1999. Prior to using the name Whitman

Corporation, the company was known as IC Industries, Inc. (IC).[1]

In the mid–1980's, plaintiff was the holding company for a diversified group of operating subsidiaries known as the Whitman Group. Mr. Karl Bays, who was elected plaintiff's chief executive officer (CEO) in 1987, determined that the Whitman Group needed a more focused identity in the financial markets and among its work force. Mr. Bays therefore launched a program of strategic restructuring to change plaintiff from a passive holding company to a strategic management company with a focus on consumer goods and services. As a result, plaintiff changed its name to Whitman Corporation, substantially increased its long-term bank debt, and used proceeds for the bank financing and the sale of one of its subsidiaries to finance acquisitions of consumer-oriented companies and to redeem stock. After plaintiff completed these acquisitions by January 1989, it was the holding company for: (1) all of the outstanding stock of Pet Incorporated (Pet), a producer of specialty foods and confections; (2) all of the outstanding stock of Midas International Corporation, an automobile services company; and (3) eighty percent of the outstanding stock of Pepsi–Cola Bottlers, Inc., a soft drink distributor. Pet, in turn, owned all of the outstanding stock of Hussman Corporation (Hussman), a refrigeration equipment business.

Under Mr. Bays' direction, plaintiff made efforts to portray itself in the marketplace and to its workforce as a consumer products company, with Pet as its foundation. An integral part of Mr. Bays' strategy was the establishment of an ESOP that granted the employees of the various subsidiaries the right to acquire plaintiff's stock. Plaintiff maintains that Mr. Bays believed the ESOP would align the interests of the subsidiaries' employees with those of plaintiff, thus promoting a higher level of synergy, productivity and innovation among them.

Effective January 1, 1989, plaintiff established the Whitman ESOP for the benefit of these employees. On May 2, 1990, the ESOP was restated and amended, effective as of January 1, 1989 (referenced herein as amended as the "Plan"). Pursuant to the Plan, plaintiff developed the Whitman Employee Stock Ownership Trust for the purpose of administering the Plan. On July 5, 1990, the Whitman Employee Stock Ownership Trust was amended and restated,[2] effective as of January 20, 1990 (referenced herein as amended as the "Trust"). LaSalle National Bank agreed to serve as the initial independent trustee. Harris Trust and Savings Bank (Harris) later became trustee and adopted the trust agreement on July 5, 1990, effective as of January 20, 1990.

On January 20, 1989, the Trust purchased from plaintiff 1,092,896 shares of Whitman callable convertible preferred voting stock (the "ESOP Stock") pursuant to a preferred stock purchase agreement. Plaintiff maintains the total purchase price of the ESOP Stock was $500 million, which equals the $457.50 liquidation preference multiplied by the 1,092,896 shares bought by the ESOP. The ESOP Stock had a fair market value of not less than $500 million at the time of purchase. Plaintiff loaned the Trust the full amount of the purchase price of the ESOP Stock in exchange for a secured promissory note, dated January 20, 1989, in the aggregate principal amount of $500 million. Pursuant to a modification of the secured promissory note, pledge agreement and other loan documents, the terms of the secured promissory note were adjusted to make certain changes and corrections, effective as of January 1989 (the Secured Promissory Note, as modified, is referenced herein as the "ESOP Note"). The ESOP Note obligated the Trust to make 12 annual payments—on January 20th of each year—that consisted of interest accruing at 85% of the corporate base rate,[3] plus 1%, plus principal in accordance with a

---

**1.** For convenience purposes, the court refers to IC, Whitman, and PepsiAmericas as "plaintiff," since these names basically denote the same company.

**2.** The circumstances of this amendment and restatement are discussed in further detail below.

**3.** The corporate base rate came from the amount quoted periodically by the First National Bank of Chicago.

schedule set forth in the ESOP Note. In addition to the annual payments, the ESOP Note required mandatory prepayments that corresponded to any cash dividends the Trust received on the ESOP Stock.

The Plan also ordered plaintiff and its subsidiaries to make annual contributions to the Trust for the benefit of the employees who were active participants during the year. The amount of a contribution for a particular year was generally established by plaintiff's Board of Directors (Board), however, it had to be enough to allow the Trust to pay installments of principal and interest on the ESOP Note when due. The obligation to make contributions to the Plan was subject to the right of the Board to terminate the Plan at any time when business, financial or other good causes made such termination necessary.

Pursuant to a pledge agreement dated January 20, 1989, the Trust pledged as collateral for the repayment of the ESOP Note: (1) the ESOP Stock; (2) plaintiff's contributions to the Trust; (3) earnings on the collateral; and (4) proceeds of any such collateral. The terms of the pledge agreement were later modified to make certain corrections [4] (referenced herein, as modified, as the "Pledge Agreement"). Under the terms of the ESOP Note, plaintiff's sole recourse for repayment was the collateral pledged under the Pledge Agreement. In addition, the Pledge Agreement required a specific number of shares of the ESOP Stock to be released from the pledge on each annual payment date, in accordance with Treasury Regulation § 54.4975–7(b). These shares were then allocated to Plan participants.

Mr. Bays died unexpectedly in November 1989, and he was succeeded as CEO by Mr. James Cozad. Although Mr. Cozad initially continued Mr. Bays' course of action, plaintiff maintains that by early 1990 it became clear to Mr. Cozad, the Board, and the rest of plaintiff's senior management (collectively referenced as "Senior Management") that

plaintiff needed to change course in order to deal with its deteriorating financial condition.

Senior Management concluded that the best course of action was to sell Hussman. Hussman would then establish its own ESOP and assume the portion of the ESOP Note that was attributable to Hussman's participants. The Trust was, therefore, amended and restated to convert it to a master trust permitting the participation of two or more ESOPs.[5] Simultaneously, the Trust and plaintiff entered into a second modification of the secured promissory note, Pledge Agreement and other loan documents to make certain changes to facilitate the ESOP Note's refinancing.[6] The ESOP Note, as modified, was then divided into two separate promissory notes pursuant to a refinancing effective as of January 20, 1990. These two notes were the Refinancing Note and the Amended and Restated Note (collectively referred to as the "Combined Notes").

The auction process generated bids for Hussman that were significantly lower than what plaintiff's investment bankers promised Senior Management. Senior Management decided to abort the sale of Hussman in the summer of 1990 because the bids were inadequate. Consequently, Hussman did not adopt an ESOP, and plaintiff retained ownership of the Combined Notes. After abandoning the sale of Hussman, Senior Management and its advisors considered other ways to address plaintiff's deteriorating financial situation. They ultimately decided to "spin-off" Pet into a separate entity.

Plaintiff contends the decision to spin-off Pet led Senior Management to conclude that it was necessary to terminate the Plan for several reasons. For example, Senior Management decided that if plaintiff did not terminate the Plan, the spin-off would significantly increase the Plan's cost relative to plaintiff's net operating income. Also, the spin-off would produce an unwarranted increase in compensation for the remaining Plan participants. Senior Management also

---

4. This modification was effective as of January 1989.

5. This amendment and restatement was effective as of January 20, 1989.

6. This modification was effective as of January 20, 1989.

determined that the high costs associated with maintaining the Plan after the Pet spin-off would be inappropriate, unwise, and would require severe reductions in salaries and wages to offset the excessive ESOP benefits. Senior Management feared that such a reduction would result in severe employee dissatisfaction and negatively affect the performance of Whitman's common stock and the ESOP Stock after the spin-off. In addition, Senior Management was concerned that continuing the Plan after the Pet spin-off would violate the IRC limits for qualified plans, and thus cause the Plan to lose its qualified status.

At its September 28, 1990 meeting, the Board accepted the recommendations of Senior Management and voted to terminate the Plan upon receipt of a favorable ruling and determination letter from the Internal Revenue Service (IRS). The Board concluded that the termination was the only viable option for the ESOP. Plaintiff publicly announced the Pet spin-off and restructuring program in September 1990. Plaintiff's Form 10–Q, which it filed with the Securities and Exchange Commission for the quarter ending September 30, 1990, stated that this restructuring program was "designed to reduce costs, improve operating efficiencies and increase shareholder value."[7] Plaintiff recorded a pre-tax charge against book income in the amount of $170.8 million in the third quarter financial statements plaintiff included in its Form 10–Q. This $170.8 million restructuring charge contained a pre-tax charge-off of the ESOP Note in the amount of approximately $35.4 million. The amount of this charge-off was equal to the excess of the $450,694,343 aggregate principal balance of the Combined Notes[8] over the $415,283,730 aggregate liquidation preference of the 907,724 shares of unallocated ESOP Stock.[9] Plaintiff's financial statements reflected the charge-off for the year ending December 31, 1990.

After the Board voted to terminate the Plan, plaintiff informed trustee Harris of this decision. On December 21, 1990, Harris notified plaintiff that it planned to exercise its rights requiring plaintiff to redeem the ESOP Stock. Harris also stated that it intended, upon termination of the Plan, to use the proceeds from the disposition of the unallocated ESOP Stock to repay the Trust's debt owed to plaintiff.

On March 28, 1991, plaintiff formally terminated the Plan. Plaintiff paid the Trust $422,953,996 in exchange for 907,724 shares of unallocated ESOP Stock. The Trust applied plaintiff's payment to $7,289,137 of interest and $415,664,859 of principal. The remaining principal balance of the ESOP Note was $35,029,484. There was no collateral left to secure its repayment.

Plaintiff maintains that in its consolidated federal income tax return for 1990, it included interest income on the ESOP Note in the amount of $45,380,957. Plaintiff did not claim a deduction for the partial worthlessness of the ESOP Note, however, for which it had claimed a "write down" for financial reporting purposes for 1990. On December 30, 1991, plaintiff filed a timely claim for refund for the 1990 tax year (Amended Return), asserting a deduction based on $35,410,535 for the partial worthlessness of the ESOP Note. The amount of tax refund plaintiff claimed was $12,039,582, plus applicable interest.

Plaintiff alleges that the $35,410,535 it asserted in the Amended Return was based on the charge-off taken in plaintiff's books for 1990 for the ESOP Note. Plaintiff also claims it was equal to the balance of the Combined Notes on December 31, 1990, less the liquidation preference of the unallocated ESOP Stock as of that date. During the IRS's examination of plaintiff's consolidated federal income tax return for the taxable year at issue, plaintiff discovered that the $35,410,535 amount did not reflect an excess

7. Plaintiff's Motion For Summary Judgment (Pl.'s Mot.), Appendix (App.), Exhibit (Ex.) NN at 5 (Form 10–Q of Whitman Corporation for the Quarter ending September 30, 1990).

8. Plaintiff calculated the amount of the Combined Notes' principal balance after subtracting

the payment scheduled to be made on January 20, 1991.

9. The 907,724 shares were what remained after the scheduled release of shares following the January 20, 1991 payment.

of accrued dividends of $381,051. Plaintiff reduced its partial worthlessness claim to $35,029,484 to compensate for the excess $381,051, thus resulting in a tax refund request for $11,910,024, plus applicable interest.

Plaintiff contends that on May 15, 1998, it received from the IRS a proposal to disallow in full its refund claim for the partial worthlessness of the ESOP Note. On October 14, 1999, the IRS mailed plaintiff a formal notice of disallowance. Plaintiff then filed a complaint in this court on January 6, 2000, seeking a tax refund of $11,910,024, plus interest and costs. Defendant submitted its answer on April 19, 2000. After the parties completed discovery, plaintiff filed a motion for summary judgment on February 8, 2001, stating that it meets the requirements of section 166(a)(2) for a partial bad debt deduction for the 1990 tax year. Defendant submitted its cross-motion for summary judgment on April 2, 2001, asserting that plaintiff: (1) is precluded from taking a bad debt deduction because it rendered a solvent debtor insolvent; (2) cannot deduct a debt it made worthless by its own actions; and (3) suffered no out-of-pocket loss when it eliminated the Plan. Oral argument was held on October 24, 2001, in Washington, D.C. The parties completed post-argument briefing on November 26, 2001.

*Discussion*

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y, DHHS*, 998 F.2d 979 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the

opposing party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir. 1987). Alternatively, if the moving party can show that there is an absence of evidence to support the opposing party's case, the burden then shifts to the opposing party to proffer such evidence. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed. Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States*, 33 Fed.Cl. 514, 518 (1995). It does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992)).

The federal district courts and the Court of Federal Claims have concurrent jurisdiction over tax refund suits pursuant to 28 U.S.C. § 1346(a)(1) (1994) and 28 U.S.C. § 1491 (1994 & Supp.2001). *Wong v. United States*, 49 Fed.Cl. 553, 555 n. 1 (2001). A prerequisite for filing a tax refund suit in this court is to first submit the claim to the IRS. IRC § 7422(a); *see also Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1371 (2000) (dismissing claims not previously filed with the IRS for lack of jurisdiction). A decision by the Commissioner is presumed correct, and the taxpayer must rebut this presumption. *United States v. Janis*, 428

U.S. 433, 440–41, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Bubble Room, Inc. v. United States,* 159 F.3d 553, 561 (Fed.Cir.1998). The taxpayer, therefore, bears the burdens of proof and persuasion. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933). In addition, the taxpayer must establish entitlement to the specific refund claimed. *Janis,* 428 U.S. at 440, 96 S.Ct. 3021. This includes proving the exact dollar amount of the alleged overpayment. *Id.*

Plaintiff maintains it overpaid its federal income tax for 1990 because it neglected to declare a partial bad debt deduction when the Trust defaulted on the ESOP Note. Plaintiff contends Senior Management exercised sound business judgment when it determined in 1990 that $35.4 million of the ESOP Note was uncollectible. When multiplying this amount by the tax rate of 34%, plaintiff contends it should have claimed a deduction of $11,910,024 in accordance with the IRC's requirements for a partial bad debt deduction. Plaintiff believes it is entitled to a tax refund in this amount, plus interest.

Defendant argues plaintiff cannot claim a partial bad debt deduction because it was plaintiff's own actions that rendered the debt uncollectible. Specifically, defendant alleges that plaintiff forced the Trust [10] into insolvency, which caused the Trust to default on the loan. Plaintiff then released the Trust from all liability and now wants to claim a bad debt deduction. Defendant asserts the substance of this transaction clearly reveals that plaintiff is not entitled to a refund.

### A. *Establishing partial worthlessness*

Section 166 of the IRC provides, in part:

**Partially worthless debts.**—When satisfied that a debt is recoverable only in part, the Secretary *may* allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

IRC § 166(a)(2) (emphasis added). The IRC, and the regulations interpreting it, set forth various requirements for proving that a partial bad debt deduction is justified. The taxpayer must first show that the debt is business in nature. IRC § 166(d). It then is required to prove that the debt is bona fide. Treas. Reg. § 1.166–1(c). If this is accomplished, it is necessary for the taxpayer to establish whether the debt was partially worthless during the taxable year and to what extent. Treas. Reg. § 1.166–3(a)(2)(i)—(iii). A final requirement is to show that the taxpayer "charged off" on its books the amount of the bad debt claimed to be uncollectible for the taxable year at issue. Treas. Reg. § 1.166–3(a)(2)(iii). The parties agree that the debt at issue is business in nature [11] and bona fide,[12] and that plaintiff satisfied the charge-off requirement.[13] The only disputed requirement, therefore, is the worthlessness of the debt.

Generally a debt is worthless if there is no reasonable possibility of collecting all or part of it. *Estate of Mann,* 731 F.2d 267, 275 (5th Cir.1984). When deciding whether a debt is partially worthless, the IRS considers "all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor." Treas. Reg. 1.166–2(a). The taxpayer faces a heavy burden when proving partial worthlessness because, unlike a claim for a wholly worthless debt, it is within the sound discretion of the Commissioner to allow a partial bad debt deduction. IRC § 166(a)(2) ("the Secretary *may* allow such debt" (emphasis added)); Treas. Reg. § 1.166–3(a)(2)(iii); *see also Brimberry v. Comm'r,* 588 F.2d 975, 977 (5th Cir.1979). The taxpayer must demonstrate to the satisfaction of the Commissioner that the debt is partially worthless. *Brimberry,* 588 F.2d at 977. "The Commissioner's determination will not be disturbed unless it is plainly arbitrary or unreasonable, indicating an abuse of discretion." *Id.* (citation omitted);

---

10. The court notes that it refers to the Trust and Plan interchangeably in this opinion. Although technically the Plan was the debtor in this case, it was administered by the Trust who made the necessary yearly payments. The Trust was unable to make these payments on behalf of the Plan after the Plan was terminated.

11. Transcript of Oral Argument (Tr.) at 6.

12. Tr. at 6, 33.

13. Tr. at 6, 37.

*McMillan v. United States*, 84 Ct.Cl. 580, 587, 18 F.Supp. 853 (1937) (citing *United States v. Jefferson Elec. Mfg., Co.*, 291 U.S. 386, 54 S.Ct. 443, 78 L.Ed. 859 (1934); *Art Metal Constr. Co. v. United States*, 84 Ct.Cl. 312, 17 F.Supp. 854 (1937); *Boyle Valve Co. v. United States*, 69 Ct.Cl. 129, 38 F.2d 135 (1930)). The IRS must respect, however, the taxpayer's sound business judgment if the taxpayer can show that a reasonable person would conclude that the debt is only recoverable in part. *See, e.g., Estate of Mann*, 731 F.2d at 276; *Clark v. Comm'r*, 85 F.2d 622, 625 (3d Cir.1936); *The Austin Co., Inc. v. Comm'r*, 71 T.C. 955, 971, 1979 WL 3593 (1979). This determination is based on the facts presented to the IRS and any additional facts offered to the court. *George E. Warren Corp. v. United States*, 135 Ct.Cl. 305, 141 F.Supp. 935 (1956).

 Plaintiff believes it established partial worthlessness because it proved that the debt was not repaid in full. The analysis of worthlessness, however, does not end with such a superficial review. There are other considerations the Commissioner and the court must take into account, such as plaintiff's actions in relation to the debtor's default. If it was plaintiff's own conduct that rendered the Plan insolvent, it is precluded from claiming a bad debt deduction. *O'Bryan Bros., Inc. v. C.I.R.*, 127 F.2d 645, 646 (6th Cir.1942), *cert. denied*, 317 U.S. 647, 63 S.Ct. 41, 87 L.Ed. 521 (1942); *see also Roth Steel Tube Co. v. Comm'r*, 620 F.2d 1176, 1181 (6th Cir.1980); *Am. Felt Co. v. Burnet*, 58 F.2d 530, 532 (D.C.Cir.1932). Specifically, courts have concluded that "[a] taxpayer may not of its own act render a collectible debt uncollectible, charge off the debt as worthless, and then deduct it from income for purposes of taxation." *O'Bryan Bros.*, 127 F.2d at 646; *see also Roth Steel*, 620 F.2d at 1181; *Am. Felt*, 58 F.2d at 532. In addition, "[a] valid debt is not ascertained to be worthless where the creditor for considerations satisfactory to himself voluntarily releases a solvent debtor from liability." *Am. Felt*, 58 F.2d at 532.

Therefore, if the Plan was solvent and plaintiff rendered it insolvent, or if plaintiff voluntarily released it from liability for considerations satisfactory to itself, the Commissioner properly precluded plaintiff from taking its bad debt deduction. Both of these analyses rely on the solvency of the debtor— they only apply if the debtor was solvent at the time of plaintiff's conduct. Indeed, the financial condition of the debtor, especially insolvency, is the primary indicator of worthlessness.[14]

### B. Determining solvency for the partial bad debt scenario

 Defendant argues that the Plan was solvent on September 28, 1990, when Senior Management voted to terminate it. Defendant asserts that plaintiff's decision to terminate the Plan rendered the solvent debtor insolvent and was done for reasons satisfactory to plaintiff. Defendant therefore maintains the Commissioner properly denied plaintiff's bad debt deduction. Plaintiff contends the Plan was already insolvent by September 28, 1990, so its decision to terminate the Plan does not preclude its bad debt claim.

September 28, 1990 is the critical date for determining solvency in this case because it is when the Board voted to dissolve the Plan. Plaintiff did not formally terminate the Plan until March 28, 1991, nevertheless, the Board's decision on September 28, 1990, caused plaintiff to cut off its contributions and induced the trustee to exercise its rights to require plaintiff to redeem the ESOP Stock. Indeed, plaintiff claims the partial bad debt deduction for the taxable year 1990, instead of 1991, because 1990 was when the events took place that allegedly rendered the debt uncollectible.[15]

The Commissioner[16] denied plaintiff's bad debt deduction because he believed the Plan

---

**14.** Jacob Mertens, Jr., *The Law of Federal Income Taxation*, § 30.67 (2001).

**15.** Tr. at 5.

**16.** The court realizes that it was the district director who denied plaintiff's claim, however, for convenience purposes the court refers to the decision-maker as the "Commissioner," since the district director was acting under the authority of the head of the IRS.

was solvent on September 28, 1990.[17] The court cannot overturn the Commissioner's determination unless it was arbitrary and unreasonable, thus indicating an abuse of discretion. *Brimberry*, 588 F.2d at 977; *McMillan v. United States*, 84 Ct.Cl. 580, 587, 18 F.Supp. 853 (1937) (citing *United States v. Jefferson Elec. Mfg., Co.*, 291 U.S. 386, 54 S.Ct. 443, 78 L.Ed. 859 (1934); *Art Metal Constr. Co. v. United States*, 84 Ct.Cl. 312, 17 F.Supp. 854 (1937); *Boyle Valve Co. v. United States*, 69 Ct.Cl. 129, 38 F.2d 135 (1930)). If there is evidence indicating that the Plan was solvent on September 28, 1990, the court will uphold the Commissioner's conclusion.

The court must therefore determine the solvency of the Plan on said date. Defendant mentioned two definitions of "solvency" in its reply brief, including solvency in the "equity sense" and under the "balance sheet test." In the equity sense, an entity is solvent if it can pay its debts as they fall due. *Moody v. Security Pac. Business Credit, Inc.*, 971 F.2d 1056, 1064 (3d Cir.1992). The balance sheet test focuses on the liquidation value of the debtor's assets compared to the debtor's current liabilities. *Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 577 (1st Cir. 1980). The debtor's current liabilities on September 28, 1990, and what was due on said date, are critical in determining the Plan's solvency.

The parties, however, dispute the amount of the Plan's current liabilities and what was presently due on September 28, 1990. Plaintiff relies on the balance sheet test and maintains that the unpaid balance of the ESOP Note as of September 28, 1990, included accrued but unpaid interest, thus making the total amount due $477,753,024. Plaintiff contends this amount exceeded the liquidation preference of the ESOP Stock, which equaled $456,796,363, by $20,956,661. Plaintiff argues, therefore, that the Plan was already

insolvent by September 28, 1990. Defendant admits that under the balance sheet test the Plan could be considered insolvent on September 28, 1990, because accrued interest could be considered a current liability. Defendant contends, however, that the balance sheet test should not be used for defining insolvency under section 166.[18]

Defendant argues under the equity sense test that on September 28, 1990, the Plan was still solvent because it was capable of paying its debts as they fell due. Defendant emphasizes that plaintiff expected the ESOP Note to be paid off by dividends and contributions collected over the existence of the ESOP, and that this option remained available had plaintiff not terminated the Plan. Presumably, the Plan could have continued to meet the annual January 20th deadline if plaintiff maintained its yearly contributions. Plaintiff believes the equity sense test does not apply to the bad debt scenario.

After considering these proposed tests, the court concludes that the balance sheet test shows that plaintiff was insolvent on September 28, 1990, but the equity sense test reveals it was still solvent. These conflicting results obviously present a problem because the tests provide different outcomes for this case. If the court applies the balance sheet test it should probably rule in favor of plaintiff, but if it uses the equity sense test it must grant defendant's motion. There is no clear rule on which test should apply because some courts have used the equity sense test, *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056 (3d Cir.1992); *Roth Steel Tube Co. v. Comm'r*, 620 F.2d 1176 (6th Cir.1980); *Trinco Indus., Inc. v. Comm'r*, 22 T.C. 959, 1954 WL 291 (1954), and others have applied the balance sheet test. *Constructora Maza, Inc.*, 616 F.2d at 573; *Hamlen v. Welch*, 116 F.2d 413 (1st Cir.1940); *Olympia Harbor Lumber Co. v. Comm'r*, 79 F.2d 394 (9th Cir.1935). There is no indication by the

---

17. The copy of the Commissioner's decision that plaintiff provided to the court includes nothing more than the cover letter stating that plaintiff's deduction was denied. Pl.'s Mot., App. Ex. TT (Disallowance of Refund Claim by the Internal Revenue Service). Plaintiff's attorney made clear at oral argument, however, that "the government is making today the same argument that

the IRS made." Tr. at 42. Specifically, plaintiff's attorney admitted that the Commissioner denied plaintiff's deduction because plaintiff had rendered a solvent debtor insolvent. Tr. at 41–42.

18. Defendant's Response To The Plaintiff's Surreply Brief at 3.

United States Court of Appeals for the Federal Circuit as to which test applies to the bad debt scenario.

The court concludes, however, that the uncertainty caused by these two tests does not prevent the court from rendering a decision in this case. As discussed above, section 166 makes clear that it is well within the discretion of the Commissioner to grant or deny a partial bad debt deduction. IRC § 166(a)(2) ("the Secretary *may* allow such debt" (emphasis added)). The court may overrule the Commissioner only if it is clear that his decision was arbitrary or unreasonable, thus indicating an abuse of discretion. *Brimberry*, 588 F.2d at 977; *McMillan*, 84 Ct.Cl. at 587, 18 F.Supp. 853 (citing *United States*, 291 U.S. at 386, 54 S.Ct. 443; *Art Metal Constr. Co.*, 84 Ct.Cl. 312, 17 F.Supp. 854; *Boyle Valve Co.*, 69 Ct.Cl. at 129, 38 F.2d 135). The court must therefore afford the Commissioner great deference when reviewing his decision. As long as there is some rational basis for his conclusion, the court will uphold it.

The equity sense test clearly supports the Commissioner's finding that the Plan was solvent on September 28, 1990. Many courts have applied the equity sense test. The court understands that from the evidence provided by the parties it is not clear whether the Commissioner actually used the equity sense test when rendering his decision. This does not matter, however, since said test supports the Commissioner's ultimate finding. It proves that his conclusion was not arbitrary or unreasonable.

Moreover, the court is not convinced that the balance sheet test should apply to the bad debt scenario, especially when a long-term loan such as the ESOP Note is involved. As explained in Mertens *The Law of Federal Income Taxation*, "evidence of insolvency based upon book value of assets does not necessarily establish the worthlessness of a debt because book value may or may not correspond to the fair market value of the enterprise or its assets." [19] The mere fact that "on paper" plaintiff could be deemed

insolvent on September 28, 1990, does not mean the debt at issue was uncollectible at that time. The ESOP Note was a long-term loan. Recognized accounting principles consider such a long-term borrowing as not constituting a current liability and not causing a debtor's insolvency unless it "[is] or will be callable by the creditor either because the debtor's violation of a provision of the debt agreement at the balance sheet date makes the obligation callable, or because the violation, if not cured within a specified grace period, will make the obligation callable." *In re Coated Sales, Inc.*, 144 B.R. 663, 676 (Bankr.S.D.N.Y.1992) (quoting Financial Accounting Standard 78). Otherwise the debtor could be considered insolvent soon after receiving the long-term loan because its present assets, as reflected in its balance sheet, may not be able to cover the full amount of the loan. The purpose of a long-term loan is for it to be repaid over time, as the debtor earns the money to make each payment. The ESOP Note was not callable on September 28, 1990, because the Plan had made all of its required payments up to that date. There is no indication that the Plan would still have defaulted on the Loan if plaintiff had not terminated the Plan and cut off its contributions. The court is not willing to base its decision on a definition of solvency provided by the balance sheet test that considers the holder of a long-term loan insolvent even though the loan had not been called and no amount was currently due.

## C. *Effect of plaintiff's actions*

The court therefore agrees with the Commissioner that the Plan was solvent on September 28, 1990. If the Board had not terminated the Plan on said date, the Trust would have been able to continue making its yearly payments. A result of the Plan's termination, however, was the loss of plaintiff's contributions. The Trust could only make payments on the ESOP Note from limited sources, including plaintiff's payments to the Plan, the pledged ESOP Stock, and the earnings on the pledged assets. Af-

---

**19.** Jacob Mertens, Jr., *The Law of Federal Income Taxation*, § 30.67 (2001); *see also Trinco Indus., Inc.*, 22 T.C. at 965.

ter plaintiff discontinued its contributions, the Trust was unable to pay off the ESOP Note because the value of the ESOP Stock was not enough to cover the remaining balance. This lack of funds caused the Trust to default on the ESOP Note. It was plaintiff's actions, therefore, that caused this solvent debtor to become insolvent. Plaintiff's conduct precludes it from claiming its bad debt deduction. *O'Bryan Bros.*, 127 F.2d at 646; *see also Roth Steel*, 620 F.2d at 1181; *Am. Felt*, 58 F.2d at 532.

Moreover, the court believes that plaintiff terminated the Plan for considerations satisfactory to itself. Plaintiff lists several reasons why Senior Management determined that this action was in the best interest of plaintiff, including, if the Plan was maintained: (1) increased costs of the Plan relative to plaintiff's net operating income; (2) an unwarranted increase in the compensation of the remaining Plan participants; (3) the necessity to implement severe reductions in salaries and wages to offset the excessive ESOP benefits; (4) severe employee dissatisfaction as a result of said reductions; and (5) a possible violation of the IRC limits for qualified plans. "A valid debt is not ascertained to be worthless where the creditor for considerations satisfactory to himself voluntarily releases a solvent debtor from liability." *Am. Felt*, 58 F.2d at 532. This further supports the Commissioner's decision to deny plaintiff's claim.

Plaintiff has failed to prove that the debt was partially worthless, because it was its own actions that rendered the solvent debtor insolvent. Plaintiff also voluntarily released the solvent debtor for reasons satisfactory to itself. The court will therefore uphold the Commissioner's decision because it was not arbitrary or unreasonable, thus constituting an abuse of discretion. *Brimberry*, 588 F.2d at 977. Plaintiff's claim for a partial bad debt deduction was properly denied.[20]

### Conclusion

For the above-stated reasons, plaintiff's motion for summary judgment is DENIED.

Defendant's cross-motion for summary judgment is hereby ALLOWED. The Clerk is directed to dismiss plaintiff's complaint. No costs.

IT IS SO ORDERED.

---

20. Since plaintiff's actions preclude it from claiming a partial bad debt deduction, it is unnecessary for the court to consider whether plaintiff incurred an out-of-pocket loss when it transferred stock to the ESOP.