T.C. Memo. 2006-195


UNITED STATES TAX COURT


ABC BEVERAGE CORP., f.k.a. BEVERAGE AMERICA, INC.,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14868-02.          Filed September 11, 2006.


<u>Ronald G. Dewaard</u> and <u>Kaplin S. Jones</u>, for petitioner.

<u>Lawrence C. Letkewicz</u> and <u>David Flassing</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined a $5,169,946

deficiency in petitioner's Federal income tax for 1995 by denying

petitioner a $10 million partial bad debt deduction under section

166.[1]  After concessions,[2] we must determine whether $10 million
of an $18 million debt became worthless in 1995.

                          FINDINGS OF FACT

     Some of the facts have been stipulated and are so found.
The stipulation of facts and the accompanying exhibits are
incorporated by this reference.  Petitioner's principal place of
business was Northlake, Illinois, at the time it filed the
petition.

     The issue in this case arose as a management group attempted
to respond quickly to a changing business environment in the
bottling industry.  As background, we explain the bottling
industry in general and the economic environment in which it
existed.

Bottling Industry

     The soft drink bottling business around 1986 consisted of
the "big three."  There were two well-known titans, Coke and
Pepsi, and a third quasi-independent network that encompassed all
other beverages.  Independent beverage labels at that time
included drinks like Squirt, Dr. Pepper, 7-Up, Burns, and certain
"new age" drinks.  The independent bottling network was also

_____

     [1]All section references are to the Internal Revenue Code in
effect for the year at issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure, unless otherwise
indicated.

     [2]The parties have resolved all other issues raised in the
deficiency notice and the petition.

two-tiered in the sense that there were independent concentrate makers and independent bottling facilities, each usually owned separately yet dependent upon one another.

Economic Landscape

The bottling industry began to realign fundamentally around 1986 as Coke and Pepsi vertically integrated their bottling businesses by buying their bottling facilities.  Coke and Pepsi could then produce, bottle, and distribute their own beverages without independent bottlers.

This marked an important departure from the bottling business of the past when bottling facilities could contract with Coke or Pepsi to exclusively bottle and distribute their drinks in a given geographic region.  Independent bottling companies lost that resource after Coke and Pepsi vertically integrated and pressured the independent bottling companies to sell their franchise rights to Coke or Pepsi.

In addition, 1986 was the heyday of the leveraged buyout (LBO) era, in which investors were scouring the country for high cashflow industries.  The bottling industry with its fairly high cashflow business was an attractive industry for an LBO.

Bottlers

One LBO opportunity in the bottling industry arose when Philip Morris, Inc. chose to exit the soft drink bottling business.  The managers of this bottling business (the management

group) saw an opportunity to buy the business they had been managing in an LBO.  Although several other competing groups also sought to buy the bottling business, the management group assembled its financing sooner than the competitors and purchased the company, Mid-Continent Bottlers, Inc. (Bottlers), a subsidiary of Philip Morris, Inc., in 1986.

Bottlers was an independent soft drink bottling business in the Midwest, operating primarily in Iowa, Nebraska, and portions of Illinois, Kansas, and Missouri.  Bottlers bottled mainly for Cadbury.  In fact, Cadbury was about 90 percent of Bottlers' business.  Cadbury maintained considerable control over Bottlers' ability to transfer its franchise agreements to bottle for Cadbury to other parties.  These franchise agreements were key to Bottlers' business and among its most valuable assets.

Financing the Leveraged Buyout

The management group used an LBO to finance the purchase of Bottlers from Philip Morris, Inc.  Once the LBO was completed, the management group, consisting of seven executives, owned less than 40 percent of Bottlers.

The financing for the transaction took several forms.  Not all of the financing was on the most advantageous terms because of certain business exigencies.  For example, the management group was anxious to acquire an ownership interest in Bottlers rather than remain employees, and the management group was under

a tight timetable to complete their financing before competing bidders could.

## The Lease

One portion of the LBO financing was both a capital contribution and asset financing from a sale-leaseback entity called Corporate Property Associates 7 (CPA7). In this LBO financing arrangement, CPA7 agreed to purchase the bottling facilities Bottlers used to bottle its products (located in seven locations in three States) and lease them to Bottlers on terms favorable to CPA7. The lease had a 25-year term and contained significant rent escalators. As a result, the lease offered a premium to CPA7 because it would eventually rent at premium or above-market rates as the rent escalated.

Because of the onerous lease provisions, the management group knew Bottlers eventually had to renegotiate or buy out the lease to avoid the rent escalators. Six years after the LBO, the management group was considering buying the bottling facilities from CPA7 to avoid further rent escalators, but the prospect of Bottlers owning the bottling facilities posed three problems.

First, the management group wanted Bottlers to be salable to Coke or Pepsi. Neither Coke nor Pepsi, however, would buy Bottlers if it owned bottling facilities because Coke and Pepsi already had bottling facilities.

Second, Cadbury had the contractual right to disapprove any sale of Bottlers' franchise rights. Cadbury insisted the franchise rights be sold only to Coke or Pepsi so that Cadbury products would be placed in Coke or Pepsi vending machines.

Third, buying the bottling facilities would cause friction with Bottlers' limited partners. Around 1989, Bottlers replaced some of its original LBO financing by selling equity interests in a limited partnership to approximately 50 independent investors. The limited partners and the management group had different views on how to run Bottlers. The limited partners wanted an early high return, while the management group emphasized long-term growth. These divergent views led to many heated communications, threats, and a proxy fight.

The management group decided, given these internal and external business reasons, that it was best to lease the facilities rather than own them outright. The management group wanted a third party to buy the bottling facilities from CPA7, assume the lease, and then renegotiate the lease to remove the rent escalators.

A Buyer

Bottlers identified G&K Properties, Inc. (G&K) as a potential buyer that would lease the facilities to Bottlers on renegotiated (and more favorable) terms. G&K was an unrelated Iowa real estate development company with which Bottlers had

previously worked.  G&K was interested in expanding its real estate holdings by buying the facilities.  G&K and Bottlers drafted a letter of intent formalizing G&K's intent to purchase the bottling facilities for approximately $18 million.  G&K had identified a life insurance company in Davenport, Iowa, as a potential source of financing but needed time to work out the details.

While G&K was obtaining the necessary financing, the management group worked on avoiding the rent escalators in the CPA7 lease and approached CPA7 regarding a sale.  Initially CPA7 requested $22 million for the bottling facilities, but Bottlers and CPA7 ultimately agreed on a $17.8 million price.  To lock in the $17.8 million price tag and avoid further rent escalators, the management group found a short-term, interim solution to give G&K the time it needed to obtain the financing.  The management group decided to create a third-party company to own the assets temporarily until G&K's financing came through.

Neither Bottlers nor CPA7 appraised the underlying facilities during their negotiations.  Instead, the lease payments drove the price, which was based on the present value of the future stream of payments.  Bottlers recognized that this price included a premium over fair market value because of the unfavorable lease terms.  The management group knew it needed to

act quickly to complete the deal and to avoid further escalations of rent.

The Purchase

The management group formed an unrelated entity called Mid-Con Properties, Inc. (Properties) as a short-term solution to buy the bottling facilities from CPA7 in 1994. The management group owned 100 percent of Properties.

To fund the purchase, Bottlers obtained a loan from one of its original LBO investors, the Prudential Life Insurance Company (Prudential). Bottlers lent the loan proceeds to Properties (the Properties loan) on the same terms Bottlers had with Prudential. Properties then used the proceeds to buy the facilities from CPA7 and assumed the lease. The bottling facilities collateralized the loan from Bottlers.

Properties and Bottlers amended the lease to remove the rent escalators and implemented a rent payment structure equaling the amounts due on the Properties loan. Accordingly, Bottlers periodically paid Properties rent payments, and Properties paid Bottlers loan payments at the same times. Bottlers' rent payments equaled Properties' loan payments. No cash needed to be transferred between Properties and Bottlers for them to satisfy their respective loan and lease obligations to each other. This zero net cashflow effect was an essential part of the deal to satisfy Prudential that the payments Bottlers made to Properties

(of rent) would return to Bottlers when Properties made payments to Bottlers (of loan repayment), and Properties could not divert any cash to other uses.  Prudential approved the loan on these terms.

Petitioner and respondent stipulated that Properties' purchase of the bottling facilities from CPA7 was not motivated in any significant way by tax considerations and that Bottlers and Properties were not related parties under the Code.

The management group had a reasonable expectation that G&K would acquire the necessary financing to purchase the facilities to satisfy the loan or that the loan would be repaid through rental income.  They expected that once the transaction with G&K closed and G&K paid the $18 million purchase price to Properties, Properties would pay Bottlers the balance due on the Properties loan, and Bottlers would pay Prudential the balance due on its loan.  The parties intended that Properties would be liquidated once G&K bought the facilities.

The management group continued working with G&K through the end of 1994, when the first full payment of principal and interest on the Properties loan was due.  Given the short-term solution that creating Properties was intended to be, the management group decided Bottlers should not make full lease payments to Properties.  Bottlers paid only enough so that Properties could pay interest on the Properties loan, not the

principal.  Properties' bookkeeping entries reflected Bottlers' failure to pay the full amount of rent and Properties' corresponding failure to repay principal on the loan.

The management group had not anticipated that it would take G&K so long to obtain the financing.  Given this delay, the management group decided not to pay the full amount of rent for two reasons.  First, they were concerned that paying the portion of the rent corresponding to the principal Properties owed would enable Properties, which was owned by the management group, to build equity in the facilities, which might alarm the limited partners.  Second, the important net zero cashflow effect of the transaction would be destroyed if Bottlers paid Properties the rent corresponding to the principal.  Properties would have an interest deduction for the portion of the rent corresponding to the interest but no deduction for the portion of the rent corresponding to the principal.  Properties would therefore have net income and would be exposed to income tax.

Buyer Financing Collapses

Unexpectedly, G&K's purchase of the bottling facilities fell through in early 1995.  The insurance company G&K expected to provide the bulk of the financing was unable to complete the deal.  Bottlers searched fruitlessly for alternate buyers.

Brooks Beverage Transaction

Brooks Beverage approached Bottlers regarding a business combination shortly after the G&K financing fell through. Brooks Beverage was interested in combining with Bottlers for several reasons. Brooks Beverage wanted to consolidate its position as a large independent bottler. It also preferred that Bottlers not be sold piecemeal to Coke or Pepsi, which might fragment the independent bottling network further. In addition, unbeknownst to Bottlers, Cadbury had already approved Brooks Beverage's proposed combination with Bottlers. Combining the companies made logistical sense as well because Bottlers served a different geographic region than Brooks Beverage, and Brooks Beverage, therefore, could reach a larger geographic region by combining with Bottlers. Moreover, Bottlers was the third largest independent bottling company in the country, and Brooks Beverage was the second. The two companies, when combined, would offer synergies and economies of scale and would help fortify the entire independent bottling industry. Bottlers agreed to the proposed transaction.

Brooks Beverage acquired all the stock of Bottlers for $48.5 million in 1995. The resulting new company was called Beverage America, Inc. (BevAm) (now ABC Beverage Corp.). The management group received stock in BevAm and accepted executive positions with BevAm in the transaction.

Post-Combination

    After the entities combined, BevAm conducted appraisals of all the bottling facilities.  The facilities were appraised for approximately $8 million based on their fee-simple (not lease-fee) value.  BevAm's accounting firm advised BevAm that it had a potential worthless debt because the collateral securing the debt was worth less than the debt.  In addition, the accounting firm noted that Properties had not been making full loan payments to Bottlers (because Bottlers had not been making full rent payments to Properties), and Properties was therefore in default.

    In addition, BevAm preferred to own the facilities outright for three reasons.  First, BevAm wanted the flexibility to make certain changes to the facilities without lease restrictions.  Second, BevAm did not want certain members of the management group owning equity in Properties while others did not.  Third, the rationale for not owning the bottling facilities (i.e., keeping Bottlers salable to Coke or Pepsi) no longer existed after the BevAm transaction.  For these reasons, BevAm declared Properties in default, seized the bottling facilities and some cash in exchange for releasing Properties from the loan, and deducted the difference between the value of the assets ($8 million) and the unpaid principal on the Properties loan ($18 million) on its consolidated return for 1995.

Respondent issued petitioner a deficiency notice denying the $10 million partial bad debt deduction for 1995.  Petitioner timely filed a petition.

OPINION

The issue in this case arose in the context of a fast-paced and changing business environment.  While the management group made the best business decisions under the circumstances at the time, exigent circumstances beyond the management group's control caused the management group not to be able to achieve their goals.  We are now called upon, more than 10 years later, to decide the tax consequences of these business decisions.

The parties stipulated that the parties were not related under the Code and that there was no tax motivation underlying the transaction between Bottlers and Properties.  The parties also stipulated that Bottlers had a reasonable expectation that the Properties loan would be repaid.  Respondent does not challenge the substance of the transaction.

The issue before us, put simply, is whether petitioner is entitled to deduct a portion of the debt, $10 million, because it was partially worthless.[3]  More broadly speaking, we are asked to

_____

[3]Petitioner has the burden of proof because the examination commenced before July 22, 1998, the effective date of sec. 7491. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.

decide whether a creditor may deduct a bad debt where the creditor's actions contributed to the debtor's default.

We proceed by explaining the general legal principles surrounding partial bad debt deductions under section 166(a)(2). We then analyze and distinguish a Court of Federal Claims case concerning a similar issue.

General Rules Under Section 166

Whether a debt has become partially worthless is a facts and circumstances determination. Sec. 166(a)(2); sec. 1.166-2(a), Income Tax Regs. A taxpayer can establish worthlessness by showing that a debt has neither current nor potential value. Dustin v. Commissioner, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972).

Though the Commissioner's determination is generally presumed correct, the Commissioner must reasonably exercise his discretion. Brimberry v. Commissioner, 588 F.2d 975, 977 (5th Cir. 1979), affg. T.C. Memo. 1976-209; Portland Mfg. Co. v. Commissioner, 56 T.C. 58, 72 (1971), affd. on other grounds 35 AFTR 2d 75-1439, 75-1 USTC par. 9449 (9th Cir. 1975). The Commissioner's exercise of discretion regarding a bad debt should not be reversed unless it is plainly arbitrary and unreasonable. Ark. Best Corp. & Subs. v. Commissioner, 800 F.2d 215, 221 (8th Cir. 1986), affg. in part and revg. in part 83 T.C. 640 (1984), affd. on other grounds 485 U.S. 212 (1988); Brimberry v.

Commissioner, supra; Findley v. Commissioner, 25 T.C. 311, 318 (1955), affd. 236 F.2d 959 (3rd Cir. 1956).

Whether a bad debt deduction is proper must be analyzed according to "reasonableness, commonsense and economic reality." Scovill Mfg. Co. v. Fitzpatrick, 215 F.2d 567, 570 (2d Cir. 1954) (quoting Belser v. Commissioner, 174 F.2d 386, 390 (4th Cir. 1949), affg. 10 T.C. 1031 (1948)). In addition, the Commissioner's discretion is not absolute, and the Commissioner cannot ignore the sound business judgment of a corporation's officers. Portland Mfg. v. Commissioner, supra at 73 (upholding a partially worthless debt deduction where corporate officers concluded that the debtor had no value as a going concern, and corporation could recover only the value of the debtor's assets).

All pertinent evidence is considered in determining worthlessness. See sec. 1.166-2, Income Tax Regs. The evidence to be considered includes the value of the collateral securing the debt and the financial condition of the debtor. Sec. 1.166-2(a), Income Tax Regs. Legal action to enforce payment is not required where the surrounding circumstances indicate that a debt is worthless and legal action would likely not result in satisfactory relief. Sec. 1.166-2(b), Income Tax Regs. A debt has been found not to be worthless where the debtor is a going concern with the potential to earn a future profit. Liggett's

Estate v. Commissioner, 216 F.2d 548, 549-50 (10th Cir. 1954), affg. a Memorandum Opinion of this Court.

A taxpayer must generally show that identifiable events occurred to render the debt worthless during the year in which the taxpayer claimed the deduction. Am. Offshore, Inc. v. Commissioner, 97 T.C. 579, 593 (1991). Some objective factors include declines in the value of property securing the debt, the debtor's earning capacity, events of default, the obligor's refusal to pay, actions the obligee took to pursue collection, subsequent dealings between the obligee and obligor, and the debtor's lack of assets. Id. at 594. No single factor is conclusive. Id.

Petitioner has shown that a series of specific, identifiable events occurred during 1995 that, when taken together, rendered the Properties loan worthless. See id. at 593. The most important of these events was the failure of the expected source for repayment of the Properties loan, the G&K purchase. Bottlers anticipated that Properties would own the bottling facilities for only a short time while G&K prepared to buy them. When G&K could no longer buy the facilities, the structure became untenable.

Another event that contributed to the worthlessness of the Properties loan was that Bottlers opted not to pay Properties a portion of the rent for valid business reasons, rendering it impossible for Properties to pay Bottlers the principal on the

loan because it did not have the cashflow.[4]  Third, soon after Bottlers learned that G&K would not be able to purchase the facilities, Bottlers combined with Brooks Beverage to become BevAm, and the Properties structure no longer was necessary. Finally, an appraisal revealed the bottling facilities were worth just under $8 million.  These specific, identifiable events combined to result in the worthlessness of the Properties loan in 1995.

Respondent argues that Properties was a going concern with potential value in 1995 and that therefore, the Properties loan was not partially worthless during that year.  See Crown v. Commissioner, 77 T.C. 582 (1981); Findley v. Commissioner, 25 T.C. at 318.  Respondent argues that Properties had sufficient income and/or sufficient assets to satisfy its loan obligations. Respondent sets forth several ways in which Properties could have met its obligations.  For example, respondent argues that

---

[4]Respondent argues that there is no evidence that Bottlers failed to pay Properties the full amount of rent due on the lease.  We disagree.  We found the testimony of Mr. Trebilcock, the chairman and president of Bottlers, to be credible on this point.  Petitioner also introduced Properties' accounting records as evidence that Bottlers did not pay the full amount of rent for 1994 and 1995.  Moreover, had Bottlers paid Properties the full amount of rent, Properties eventually might have not had the cash to pay Bottlers the principal on the Properties loan anyway because Properties might be required to pay taxes on the rental income it received from Bottlers, depleting its cash.  This cash depletion was precisely what the management group was attempting to avoid by having Bottlers pay Properties only a portion of the rent due.

Properties could have exercised its rights under the lease to cause Bottlers to buy the facilities when Bottlers failed to pay the full amount of rent. Respondent further argues that Properties could have found another third party to buy the facilities.

Respondent's focus on the theoretical possibilities of what might occur does not give sufficient credence to the realities of the business environment. See Portland Mfg. Co. v. Commissioner, 56 T.C. at 72. One of respondent's theoretical suggestions, for example, is that Properties should have caused Bottlers to buy the facilities once Bottlers failed to pay the full amount of rent. This decision would not have been in the best interests of Bottlers, and the management group, owing fiduciary duties to Bottlers, would not have made it. There were also no other third-party buyers for the bottling facilities, although respondent suggests other actions Bottlers should have taken to seek them. The management group searched fruitlessly for other third parties when the G&K deal collapsed.

While the management group may have made other choices if they had the benefit of hindsight, they did what they thought was best for Bottlers based on the circumstances at the time. See id. Properties was unable to repay the loan once G&K's financing fell through and G&K became unable to purchase the facilities. Cf. Crown v. Commissioner, supra; Findley v. Commissioner, supra.

The structure of the transactions ensured that there was no source of funds for Properties. Respondent's hypothesizing over what could or should have been done ignores the realities of the business and is unreasonable. Respondent's determination that the Properties loan was not worthless in 1995 therefore was arbitrary, unreasonable, and an abuse of discretion.

We find that the Properties loan was partially worthless in 1995.

## Bad Debt Deduction Where Creditor's Actions Contribute to Worthlessness

We next consider whether petitioner may deduct the Properties loan as partially worthless although the legitimate business decisions of petitioner's predecessor, Bottlers, contributed to the worthlessness of the Properties loan. Respondent argues that Bottlers failed to pay the full amount of rent, which, in turn, caused Properties to be unable to repay the loan. Respondent argues that petitioner is therefore not entitled to the deduction. We disagree. Petitioner's legitimate business decisions contributing to the worthlessness of the Properties loan do not preclude the bad debt deduction.

It is well settled that certain actions of a creditor do preclude bad debt deductions. For example, a taxpayer may not voluntarily release a solvent debtor and then claim a deduction for a worthless debt. Roth Steel Tube Co. v. Commissioner, 620 F.2d 1176 (6th Cir. 1980), affg. 68 T.C. 213 (1977); Am. Felt Co.

v. Burnet, 58 F.2d 530, 532 (D.C. Cir. 1932), affg. 18 B.T.A. 504 (1929). A creditor who voluntarily relinquishes valuable collateral provided by a solvent debtor also may not deduct the debt as worthless. O'Bryan Bros. v. Commissioner, 127 F.2d 645, 646 (6th Cir. 1942), affg. 42 B.T.A. 18 (1940).

Neither party was able to point us to a case directly on point. Respondent relies on a recent Court of Federal Claims decision indicating that a taxpayer may not deduct a worthless debt where the taxpayer's actions, standing alone, have made the debt uncollectible. PepsiAmericas, Inc. v. United States, 52 Fed. Cl. 41 (2002). Respondent argues that we should extend the reasoning of PepsiAmericas to this case to hold that petitioner may not deduct a portion of the Properties loan as a worthless debt because Bottlers contributed to its worthlessness by failing to pay Properties the full amount of rent.

In PepsiAmericas, the taxpayer made a loan to its ESOP, terminated the ESOP, and tried to deduct the amount the ESOP owed as a worthless debt. Id. The court held the taxpayer could not deduct the amount lent to the ESOP as a worthless debt because the taxpayer's own conduct caused the worthlessness. Id. at 48 (citing Roth Steel Tube Co. v. Commissioner, supra at 1181,

O'Bryan Bros., Inc. v. Commissioner, supra at 646, and Am. Felt Co. v. Burnet, supra at 532).[5]

PepsiAmericas is not controlling.  There are significant differences between the facts of PepsiAmericas and the facts here.  Control is the first major difference.  PepsiAmericas controlled the entity whose debt it caused to become worthless. PepsiAmericas, Inc. v. United States, supra.  In contrast, Bottlers did not control Properties.  While the management group had some ownership of both entities, the parties stipulated that the entities themselves were not related.  Bottlers itself could not control the decisions of Properties, alter the ownership of Properties, or cause Properties to take any actions whatsoever other than under the lease and the loan.

The cause of the worthlessness is the second major difference.  While PepsiAmericas terminated its ESOP and thus unilaterally caused the ESOP to be unable to pay its debts, several factors contributed to the worthlessness of the

---

[5]The PepsiAmericas and O'Bryan cases broadly interpret other cases involving this issue.  See PepsiAmericas, Inc. v. United States, 52 Fed. Cl. 41, 48 (2002) (citing Roth Steel Tube Co. v. Commissioner, 620 F.2d 1176, 1181 (6th Cir. 1980), affg. 68 T.C. 213 (1977); O'Bryan Bros. v. Commissioner, 127 F.2d 645, 646 (6th Cir. 1942), affg. 42 B.T.A. 18 (1940); and Am. Felt Co. v. Burnet, 58 F.2d 530, 532 (D.C. Cir. 1932), affg. 18 B.T.A. 504 (1929)).  A narrower interpretation is that a creditor cannot release a solvent debtor and then claim a deduction for a worthless debt.  Roth Steel Tube Co. v. Commissioner, supra; O'Bryan Bros. v. Commissioner, supra; Am. Felt Co. v. Burnet, supra.

Properties loan.  See id. at 45.  The key contributing factor to Properties' inability to repay the loan was G&K's failure to obtain financing, wholly out of the control of Bottlers. Properties anticipated that G&K would purchase the bottling facilities, but ultimately G&K could not.  While Bottlers' failure to pay the full amount of rent due contributed to the worthlessness of the loan,[6] other factors contributed as well. These two significant differences convince us that it would be inappropriate to follow PepsiAmericas here.

We also decline respondent's invitation to articulate an absolute rule that a taxpayer may never deduct a debt as worthless if the taxpayer contributed to the worthlessness.  We find that legitimate business decisions contributing to the worthlessness of a debt do not preclude a bad debt deduction in these circumstances.  Cf. PepsiAmericas, Inc. v. United States, supra at 48.  Accordingly, we find that petitioner may deduct the worthless portion of the Properties loan notwithstanding that Bottlers' actions contributed to its worthlessness.

---

[6]Even if Bottlers had paid the full amount of the rent due under the lease, Properties still might have been unable to satisfy its obligations under the loan without a third party purchasing the bottling facilities.  Properties would not be able to deduct principal payments it paid Bottlers on the loan and would thus have more income than deductions, giving rise to income tax liability.  This liability would ruin the net zero cashflow effect of the deal and would cause Properties to be unable to repay the loan.

Conclusion

Petitioner may deduct $10 million as a worthless debt in 1995. The Properties loan was partially worthless in 1995 because identifiable events occurred during that year that made it certain that Properties would be unable to repay it. Respondent's determination to the contrary was unreasonable and an abuse of discretion. Although petitioner's predecessor, Bottlers, may have contributed to the worthlessness of the Properties loan, this action does not preclude petitioner from a bad debt deduction where other major business factors contributed to the worthlessness.

In reaching our holding, we have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing and the concessions of the parties,

Decision will be entered under Rule 155.