T.C. Memo. 2013-98

UNITED STATES TAX COURT

MARK A. BISHOP, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20810-10.                          Filed April 10, 2013.

<u>Robert P. Lowell</u>, for petitioner.

<u>Monica D. Gingras</u> for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  The instant petition involving petitioner's 2006 Federal

income tax return seeks a redetermination of respondent's determination of a

[*2] deficiency of $88,769, an addition to tax under section 6651(a)(1)[1] of $21,335.50, and a penalty under section 6662(a) of $17,753.80. We decide the following issues: (1) whether petitioner is entitled to a bad debt deduction under section 166 for 2006. We hold that he is not; (2) whether petitioner is liable for the addition to tax under section 6651(a)(1). We hold that he is; and (3) whether petitioner is liable for the accuracy-related penalty imposed under section 6662(a). We hold that he is.

## FINDINGS OF FACT

The parties filed with the Court a stipulation of facts and related exhibits. The stipulated facts and the accompanying exhibits are incorporated herein by this reference. We find the facts accordingly. Petitioner resided in California when he filed the petition.

From 2001 until June 2006 petitioner was the president of IMPAC Mortgage Holdings, Inc. (IMPAC), where he worked as a whole-loan trader who bought and sold pools of loans. During the same period petitioner was also the president of Novelle Financial (Novelle)--a company IMPAC acquired in September 2001 and wholly owned at least until June 2006--where petitioner

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) in effect for the year at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] worked as a mortgage lender.[2]  Between IMPAC and Novelle, petitioner worked approximately 60 hours a week.  From June 2006 through the rest of the year petitioner worked for Quick Loan Funding (Quick Loan) as its president whose duties were mainly focused on the pooling of mortgages originated at Quick Loan and their sales to investment banks.  While at Quick Loan, petitioner worked about 60 hours a week.

Around 2004 and 2005, IMPAC was seeking local appraisers to provide appraisal services in connection with its purchases of mortgage loans.  Landmark Equities Group (Landmark), which was a real estate appraisal firm that provided appraisal services to many local lenders from whom IMPAC purchased its mortgage loans, would occasionally provide such services to IMPAC.  Through this relationship, petitioner became acquainted with James Eaton, who was Landmark's principal shareholder and president.

In early 2006 petitioner met with Mr. Eaton several times and learned that Landmark had begun to develop a new product called the Automated Valuation Model (AVM product), which Landmark intended to market to investment banks that purchased and securitized mortgage loans.  The AVM product would enable its users to quickly and efficiently obtain accurate valuations by aggregating title

_____

[2]Petitioner terminated his services at Novelle shortly before he left IMPAC.

**[*4]** insurance information from numerous providers that could be translated into real estate values. On the basis of these meetings, petitioner understood that Landmark would have to raise close to $20 million to fund the development and marketing of the product; in petitioner's view, shared with Landmark, this capital requirement could be met only by either equity syndication or a public offering.

Landmark's need to raise the necessary capital through a possible public offering sparked petitioner's interest in getting involved, as he thought he could capitalize on his prior success in staging an initial public offering (IPO) by advising Landmark on a similar offering in exchange for a substantial fee. In 2003 while working at IMPAC and Novelle, petitioner had successfully advised GVC Holdings on its IPO on the Alternative Investment Market (AIM) of the London Stock Exchange (LSE). Through that transaction, petitioner had acquired a few contacts, including investment bankers and attorneys in London, who petitioner thought might help Landmark stage a similar offering on the AIM market. It appears the 2003 IPO was petitioner's only experience in the area.

With respect to Landmark, petitioner believed he was uniquely positioned to prepare Landmark for a successful IPO, ostensibly because he understood Landmark's business model and the inner workings of the LSE and the AIM market. He thought the AIM was a good fit for Landmark because it was a "small

**[*5]** cap" market that had simpler disclosure requirements and shorter time-to-IPO. In exchange for the provision of his services, petitioner expected to earn a large fee that could range from three to five points on the capital raised in the IPO.

To lay the groundwork for a possible IPO, petitioner and Landmark worked together and purportedly developed a business plan, marketing materials, and a pro forma for an $80 million public offering.[3] Petitioner then contacted Collins-Stewart in London who would represent Landmark on the investment banking side and Hunton & Williams, also in London, who would be Landmark's legal representation. After some conference calls and exchanges of documents, petitioner traveled to London with Mr. Eaton, Brian Eaton, and Landmark's chief financial officer (CFO), George Shamchula, purportedly to meet with the London-based investment bankers and attorneys.[4]

But before Landmark could raise any capital through an IPO, it had immediate cash needs that had to be met in order to pay its current operational costs, such as payroll and accounts payable. Landmark tried to borrow $300,000 from Pacific Mercantile Bank (PMB), but PMB declined to extend such a loan

---

[3]Petitioner did not endeavor to submit any of these documents into evidence.

[4]The only documentary evidence relating to these meetings is a one-page meeting schedule petitioner prepared.

**[*6]** because it thought Landmark and Mr. Eaton were already overleveraged. Undeterred and determined to earn his fee one day from putting together a successful IPO deal, petitioner advanced $300,000 to Landmark to help it meet its immediate cashflow requirements so that the business could stay afloat and continue to grow while the company was preparing for an IPO on the LSE. While petitioner believed that the loan was crucial to Landmark's growth and a successful IPO, petitioner testified that he would probably have made the loan even without the prospect of the IPO because, on the basis of Landmark's financial health at the time, the loan itself appeared to be secure. Notably, petitioner did not require as a condition to the extension of the loan that Landmark pay petitioner a percentage-point fee based on any capital raised through a subsequent IPO.

To finance the loan to Landmark, petitioner decided to borrow from PMB, and on April 19, 2006, he entered into a promissory note with PMB (PMB note) in the amount of $300,000. Under the PMB note, petitioner was required to make a balloon payment plus all accrued but unpaid interest upon maturity on April 19, 2007. In addition, petitioner was required to make regular interest payments of all accrued interest due as of each payment date beginning May 19, 2006.

**[*7]**   Petitioner transferred the $300,000 in proceeds of the PMB loan to Landmark in exchange for an unsecured promissory note that Landmark executed (Landmark note) on the same date he signed his promissory note to PMB.  The Landmark note contained an acceleration clause by which in the event of default, which encompassed nonpayment of principal or interest, petitioner could by written notice declare all unpaid balance of the note and accrued interest immediately due and payable.[5]  The terms of the Landmark note--i.e., the calculation of interest and the terms of monthly payment--tracked the terms provided in the PMB note.  Further, the Landmark note was set to mature on the same date as the PMB note upon which the Landmark note would become due and payable in full.  In other words, other than the prospect of earning a large fee for

---

[5]Petitioner testified that the note contained an acceleration clause.  But on brief petitioner, along with respondent, contend that the note did not give petitioner the right to accelerate repayment of the principal balance of the note upon default.  But this contention is not supported by the terms of the Landmark note.  The fifth paragraph of the note states:  "If any of the following events (each, an "Event of Default") shall occur, * * * then, the holder of this Note may at any time by written notice * * * declare the entire unpaid principal of and the interest accrued on this Note * * * due and payable".  The entire fifth paragraph is one conditional sentence, in which the conditional clause, or the "if" clause, lists a number of alternative grounds for default and the main clause that starts with "then" describes the particular result, i.e., acceleration of the payment of principal, that would happen if any one of the alternative conditions were met.  Because "default in the payment of any part of the principal or interest on this Note" is one of the alternative conditions, petitioner had the right to exercise the acceleration clause when Landmark failed to make its interest payments.

[*8] staging an IPO for Landmark, petitioner would not make any money on the loan to Landmark under the loan's terms.[6]

In addition to making the short-term loan to Landmark, petitioner also worked between 20 and 30 hours per week for Landmark for three months from March through May 2006 to help the company prepare for an IPO. In connection with his employment at Landmark, petitioner earned wage income from Landmark of $20,000 that was reported on Form W-2, Wage and Tax Statement.[7]

---

[6]Petitioner undertook a similar financing arrangement with Daniel Sadek, who was the principal shareholder of Quick Loan. In 2006 petitioner lent $5 million to Mr. Sadek, financed by advances petitioner drew on a home equity line of credit with VirtualBank. In exchange petitioner received a secured promissory note from Mr. Sadek dated June 19, 2006 (Sadek note). According to its terms, the interest and monthly payment calculations under the Sadek note reflected the terms of the VirtualBank Home Equity Line of Credit Agreement (VirtualBank HELOC agreement) that petitioner entered into with VirtualBank on June 13, 2006. Similar to the financing arrangement with Landmark, petitioner would not make any profit on the Sadek note because the Sadek note and the VirtualBank HELOC agreement had the same terms. Petitioner claimed that the main reason he extended the loan to Mr. Sadek was to help with Quick Loan's short-term financial needs so that he could capture a large fee for staging a potential IPO for Quick Loan in the future.

[7]The parties stipulated that petitioner received Form W-2 wage income for 2006 from the following sources:

(continued...)

[*9]    Soon after the execution of the Landmark note, the real estate market showed signs of trouble and Landmark's financial condition began to deteriorate.  After Landmark failed to make its first payment under the note, due May 19, 2006, petitioner made several written demands for payment, including letters dated July 26, September 20, and November 19, 2006, requesting payment, to which Landmark did not make any specific responses.  In addition to the written demands, petitioner purportedly made other oral demands for repayment as well as personal visits to Landmark's office.

From these personal visits that took place every month throughout 2006, according to petitioner, he was able to gain access to Landmark's books and records, providing him an insider's look at Landmark's financial health.[8]  Because the note would not become due until April 2007, petitioner was interested only in

---

[7](...continued)

| Employer | Wages |
|---|---|
| Landmark | $20,000.00 |
| IMPAC | 288,454.90 |
| Novelle | 141,998.49 |
| Quick Loan | 288,000.00 |

[8]Petitioner did not offer into evidence any of the Landmark books and records that he claimed to have reviewed.

[*10] getting Landmark to meet its obligation to make interest-only payments. Indeed, petitioner conceded during trial that the three separate letters that he wrote to Landmark were demands for interest payments and not principal. And on the basis of his review of Landmark's books, petitioner believed Landmark would be able to meet its interest payment obligation and expected payments to be forthcoming. Landmark never made a payment under its note.

Despite Landmark's being in default on the note for nonpayment, petitioner did not exercise the acceleration clause and demand immediate payment of the loan's principal plus accrued and unpaid interest. While petitioner continued to think Landmark was in a position to make interest payments, on the basis of his review of the company's books he understood that Landmark would not be able to pay the entire principal sum of the Landmark note if he invoked the acceleration clause. By continuing to work with Landmark, petitioner hoped to keep Landmark on its feet so that it could make interest payments, especially if Landmark would undergo significant cuts in staff and expenses.

In any event, while petitioner's testimony shows Landmark was experiencing serious financial difficulties, nothing in the record shows one could conclude in 2006 that Landmark would never be able to repay any portion of the principal. Moreover, petitioner could not conclude whether Landmark was

[*11] insolvent by the end of 2006, and it appears to us that Landmark continued to be a going concern into 2007. Petitioner did not provide any testimony from a disinterested party or any documentary evidence other than the three written payment demands to corroborate his worthlessness claim.

John Epperson, a certified public accountant for over 40 years and petitioner's accountant for over 20 years, prepared petitioner's 2006 return. Petitioner filed a Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return, which extended the time to file the 2006 return to October 15, 2007. Despite the extension the 2006 return was not filed until May 12, 2008. It was filed late ostensibly because petitioner's extensive business travel abroad combined with Mr. Epperson's living in another State rendered it difficult for petitioner to meet with Mr. Epperson timely to discuss and prepare the filing of the 2006 return.

When petitioner was eventually able to meet with Mr. Epperson, he provided Mr. Epperson the Landmark note as well as the PMB note for review. Petitioner also told Mr. Epperson about his efforts to collect on the Landmark note but did not otherwise give Mr. Epperson any of the financial documents from Landmark that formed the basis of petitioner's determination that the Landmark

[*12] note was not collectible. Mr. Epperson never personally reviewed the financial documents in question.

On the basis of the Landmark note and the PMB note and after having reviewed certain professional publications and legal research materials, including unspecified IRS publications and court cases, Mr. Epperson determined petitioner would be entitled to claim a bad debt deduction for 2006. Correspondingly, the Schedule C, Profit or Loss From Business, attached to petitioner's 2006 return claimed an "Outside Services" deduction of $301,000.[9] According to Mr. Epperson, the deduction for "Outside Services" was a clerical mistake, and he intended to identify the deduction as a bad debt expense.

OPINION

The primary issue of this case is whether petitioner is entitled to a business bad debt deduction for 2006 under section 166(a). To be able to claim the deduction for 2006, petitioner must show (1) the Landmark note was a bona fide debt that became wholly worthless in 2006,[10] see Kean v. Commissioner, 91 T.C.

---

[9]Mr. Epperson explained at trial "to the best of * * * [his] recollection" that the $1,000 in addition to the loan principal was a transaction fee paid to PMB. Petitioner has not produced any evidence to substantiate this claim.

[10]Petitioner has not argued that the note became partially worthless, and the evidence does not show any portion of the Landmark note was charged off in 2006.

(continued...)

**[\*13]** 575, 594 (1988), and (2) the debt was not a nonbusiness debt under section 166(d). While we find the Landmark note to be a bona fide debt, we conclude petitioner has failed to meet his burden to show the note became worthless in 2006. Because petitioner cannot show the worthlessness of the Landmark note, we need not decide whether it was a nonbusiness debt as defined in section 166(d)(2).

I.     Burden of proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and a taxpayer bears the burden of proving those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Similarly, a taxpayer bears the burden to show he is entitled to claim any deductions allowed under the Code and to substantiate the amount of any claimed deductions.[11] INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs. But with respect to liability for additions to tax under section 6651 and any accuracy-related penalty under section 6662, the Commissioner bears the burden of production under section 7491(c).

_____

[10](...continued)
See sec. 166(a)(2); sec. 1.166-3(a), Income Tax Regs.

[11]Petitioner does not contend, nor does the record suggest, that the burden of proof should be shifted to respondent under sec. 7491(a).

**[*14]** II.      Section 166 bad debt deductions

A.      Bona fide debt

A section 166 bad debt can arise only if the purported debt is a bona fide

debt.  Conversely, an advance that is a capital contribution or a gift is not a debt for

purposes of section 166.  Kean v. Commissioner, 91 T.C. at 594; sec. 1.166-1(c),

Income Tax Regs.  A bona fide debt can arise only from a debtor-creditor

relationship based on a valid and enforceable obligation to pay a fixed or

determinable sum of money.  Kean v. Commissioner, 91 T.C. at 594; sec. 1.166-

1(c), Income Tax Regs.  We determine whether a purported debt is a bona fide debt

for tax purposes from the facts and circumstances of each case.  See Lundgren v.

Commissioner, 376 F.2d 623, 626 (9th Cir. 1967), rev'g on other ground T.C.

Memo. 1965-314; Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980).

The Court of Appeals for the Ninth Circuit, to which this case is appealable

absent any stipulation by the parties, see sec. 7482(b)(1)(A), has identified 11

factors with varying degrees of influence in a debt-equity analysis:

> "(1) the names given to the certificates evidencing the indebtedness;
> (2) the presence or absence of a maturity date; (3) the source of the
> payments; (4) the right to enforce the payment of principal and
> interest; (5) participation and management; (6) a status equal to or
> inferior to that of regular corporate creditors; (7) the intent of the

**[\*15]** parties; (8) 'thin' or adequate capitalization; (9) identity of interest between creditor and stock holder; (10) payment of interest only out of 'dividend' money; (11) the ability of the corporation to obtain loans from outside lending institutions." * * *

A. R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970) (quoting

O.H. Kruse Grain & Milling v. Commissioner, 279 F.2d 123, 125-126 (9th Cir.

1960)).  The Court of Appeals has also cautioned not to place a disproportionate

emphasis on any single factor.  Id.

Here, Landmark's indebtedness was evidenced by its promissory note to

petitioner showing the parties' intent to structure the advance as a genuine debt.

The note obligated Landmark to pay monthly interest and to make a balloon

payment of the principal and any unpaid but accrued interest upon maturity, which

was set at one year after the execution of the note.  The note provided an

acceleration clause by which petitioner could declare the entire balance of the note

due in the event of default.  It also appears to place petitioner on equal footing with

other unsecured creditors since there is no evidence of subordination.

Further, petitioner was not an investor in Landmark and did not otherwise

participate in its growth or management.  The Landmark note did not make the

interest-only payments contingent on corporate earnings.  Quite the opposite,

Landmark's obligation to repay the debt principal and interest was fixed and

**[*16]** determinable under the valid and enforceable promissory note. See sec. 1.166-1(c), Income Tax Regs.

Respondent maintains that the $300,000 advance was not a bona fide debt because (1) the note was unsecured, (2) Landmark was unable to borrow from PMB because it thought Landmark was already overleveraged, and (3) petitioner did not demand payment in full when Landmark defaulted and made only minimal effort to demand interest payments.

While the existence of collateral would tend to support genuine indebtedness, its absence alone is not determinative. Similarly, the fact that Landmark could not obtain a similar loan from a commercial bank because the company was already overextended is not controlling. See Lundgren v. Commissioner, 376 F.2d at 626; Taft v. Commissioner, 314 F.2d 620, 622 (9th Cir. 1963), aff'g in part, rev'g in part T.C. Memo. 1961-230. While extending a $300,000 loan to Landmark without collateral at a time when a commercial bank would not provide the same loan might sound like a risky proposition, "it is not our province to inquire into the wisdom of the loan" so long as petitioner could show genuine indebtedness. Brenhouse v. Commissioner, 37 T.C. 326, 329 (1961).

[*17] It is true that petitioner did not exercise the acceleration clause under the note as it was his right to do. But he did repeatedly make written and oral demands for interest payments. His reluctance to push Landmark too hard for payments can be explained by his credible testimony that he wanted to work with his debtor until it could improve its financial condition and recover from the real estate market crisis existing at the time so that it might resume making payments.

Ultimately, petitioner had no financial interest in Landmark and was not its shareholder before or after he provided the $300,000 loan. There was also an absence of any personal relationship between petitioner and Landmark or Mr. Eaton that would suggest the advance was a gift. Because Landmark's repayment obligation under the note was absolute, there is nothing in evidence that could explain the advance as something other than genuine indebtedness. See id. at 330. Accordingly, we find the Landmark note to be a bona fide debt.

B.    Worthlessness in 2006

Our determination of whether a debt is wholly or partially worthless is based on all facts and circumstances, including the financial condition of the debtor. Sec. 1.166-2(a), Income Tax Regs. Legal action is not required to show worthlessness if surrounding circumstances indicate that a debt is worthless and uncollectible and that any legal action in all likelihood would be futile because the

[*18] debtor would not be able to satisfy a favorable judgment.  Sec. 1.166-2(b),

Income Tax Regs.  Petitioner bears the burden to show the Landmark note became

worthless in 2006, the year for which petitioner claimed the bad debt deduction

under section 166.  See Rule 142(a); Crown v. Commissioner, 77 T.C. 582, 598

(1981).

There is no standard test or formula for determining worthlessness, and the

determination depends on the particular facts and circumstances of the case.  Lucas

v. Am. Code Co., 280 U.S. 445, 449 (1930); Crown v. Commissioner, 77 T.C. at

598.  The fact that the debt has not matured or that no payment under the debt is due

when a taxpayer claims a bad debt deduction does not of itself prevent its allowance

under section 166.  Sec. 1.166-1(c), Income Tax Regs.  But a taxpayer usually must

show identifiable events to prove worthlessness in the year claimed.  Am. Offshore,

Inc. v. Commissioner, 97 T.C. 579, 593 (1991).  Some objective factors include a

decline in the debtor's business; a decline in the value of the debtor's assets, if any;

the overall business climate; the debtor's serious financial reverses; the debtor's

earning capacity; events of default; insolvency of the debtor; the debtor's refusal to

pay; actions the creditor took to pursue collection; subsequent dealings between the

creditor and the debtor.  Id. at 594.

[*19] No single factor listed above is conclusive. Id. at 595. Moreover, the mere fact that a business is on the decline, that it has failed to turn a profit, or that its debt obligation may be difficult to collect does not necessarily justify treating the debt obligation as worthless. Intergraph Corp. & Subs. v. Commissioner, 106 T.C. 312, 323 (1996), aff'd without published opinion, 121 F.3d 723 (11th Cir. 1997). This is especially true where the debtor continues to be a going concern with the potential to earn a future profit. See Rendall v. Commissioner, 535 F.3d 1221, 1228 (10th Cir. 2008) (citing Roth Steel Tube Co. v. Commissioner, 620 F.2d 1176, 1182 (6th Cir. 1980), aff'g 68 T.C. 213 (1977)), aff'g T.C. Memo. 2006-174; ABC Beverage Corp. v. Commissioner, T.C. Memo. 2006-195, 92 T.C.M. (CCH) 268, 271 (2006).

While petitioner's testimony suggests that the Landmark note might have become worthless in 2006, it is insufficient to carry his burden to show worthlessness without testimony from a disinterested party or some documentary evidence to corroborate the claim. Petitioner's testimony as to the overall business climate in the real estate market at the time intimates that Landmark indeed experienced decline in its business, but we do not know by how much. Landmark's failure to make interest payments may reflect its inability to repay some portion of its debt to petitioner, but that failure alone is not conclusive.

[*20] Petitioner claimed he examined Landmark's financial records every month before he concluded the Landmark note was worthless, but none of the books petitioner purportedly examined is in the record for us to make an independent determination of Landmark's net worth and ability to pay in 2006. There is no evidence showing Landmark's cashflow and earnings. We do not have Landmark's balance sheet to help us determine whether its aggregate liabilities exceeded the value of its assets. Because Landmark remained a going concern into 2007, producing some evidence demonstrating its ability or inability to turn the business around and to generate enough income to pay the debt is crucial. In sum, "[t]he unsupported opinion of the taxpayer alone that the debt is worthless will not usually be accepted as proof of worthlessness." Dustin v. Commissioner, 53 T.C. 491, 502 (1969), aff'd, 467 F.2d 47 (9th Cir. 1972).

Even if we credit petitioner's testimony on its face, which we do not, it does not support a finding of worthlessness in 2006. While a determination of worthlessness does not hinge on whether any portion of the debt has become due, Landmark's nonpayment of principal could be explained by the fact that the Landmark note's principal was not due until April 2007. Indeed, petitioner never exercised the note's acceleration clause by sending the required written demand; on the contrary, petitioner stated during trial that the written demands that he did

[*21] send to Landmark were only demands for interest payments. Thus, there is nothing in the record that could even suggest that petitioner actually made an attempt in 2006 to collect on the note's principal.[12]

Even petitioner's testimony itself allows a strong inference that Landmark would be able to repay its debt under the note at some point in the future. Petitioner claimed that he reviewed Landmark's financial records. On the basis of his understanding of Landmark's financial condition, he could not determine whether Landmark was insolvent but still believed that Landmark could make interest payments, just not payments on the principal. He also believed Landmark's financial health could improve if it was willing to go through significant cuts in staff and expenses. Petitioner did not want to push Landmark into a corner by accelerating the note because if Landmark were required to repay the whole debt, as petitioner's testimony suggests, it might not be able to pay it at that moment.

But petitioner's testimony says very little about whether Landmark would be able to pay the principal in the foreseeable future, especially when petitioner was willing to provide Landmark some flexibility in meeting its payment

---

[12]The three demand letters referenced "Landmark's $300,000 note" or "the $300K note". But these are only references made to identify the note, and we do not understand them to be demands for payment of the entire principal balance.

[*22] obligation. Indeed, it appears from petitioner's testimony that there was a glimpse of hope that Landmark could get back on its feet and meet its debt obligation to him. While petitioner need not be an "incorrigible optimist", see United States v. S.S. White Dental Mfg. Co., 274 U.S. 398, 403 (1927), he needs to persuade us that there was an objective and substantial reason for abandoning any hope of repayment in the future, see Dallmeyer v. Commissioner, 14 T.C. 1282, 1291-1292 (1950). Because petitioner never exercised the acceleration clause and demanded payment of the principal, petitioner has failed to persuade us that there could not be a reasonable expectation of repayment and Landmark could not have recovered from its financial woes to satisfy the note by the date of maturity. Thus, petitioner's testimony at most can only suggest that Landmark's finances in 2006 would have prevented it from satisfying the debt in full in that year if petitioner had required it; but he never did. That is insufficient to support a finding of worthlessness.

Because we find petitioner has failed to meet his evidentiary burden to show the Landmark note became worthless in 2006, we conclude he is not entitled to the bad debt deduction under section 166(a) for 2006. Correspondingly, our conclusion renders it unnecessary to determine whether the debt was a business debt or a nonbusiness debt under section 166(d).

**[\*23]** III.    <u>Addition to tax and penalty</u>

    A.    <u>Addition to tax under section 6651(a)(1)</u>

Section 6651(a)(1) imposes an addition to tax for failure to timely file a Federal income tax return unless the taxpayer can show that the failure was due to reasonable cause and not willful neglect.  It is undisputed that petitioner did not timely file his tax return.  On brief, petitioner did not make any arguments to establish that he may avail himself of the affirmative defense.  Thus, we deem the defense waived.[13]  See <u>Zapara v. Commissioner</u>, 124 T.C. 223, 233 (2005), <u>aff'd</u>, 652 F.3d 1042 (9th Cir. 2011); <u>see also</u> <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446-447 (2001).

    B.    <u>Penalty under section 6662(a)</u>

Respondent determined that petitioner is liable for an accuracy-related penalty for 2006 because petitioner substantially understated his income tax or, alternatively, because he was negligent or disregarded rules or regulations.  <u>See</u> sec. 6662(a) and (b)(1) and (2).  There is a substantial understatement of income tax if the amount of the understatement for the taxable year exceeds the greater of

---

[13]At trial, Mr. Epperson explained the 2006 return was filed late because petitioner's extensive travel abroad made it difficult for them to meet to prepare the return timely.  Even if we were to conclude that petitioner did not abandon the reasonable cause defense, we would still find Mr. Epperson's explanation inadequate to show reasonable cause.

**[\*24]** 10% of the tax required to be shown on a return for a taxable year or $5,000.

Sec. 6662(d)(1)(A). Alternatively, we will sustain respondent's determination to

impose an accuracy-related penalty if we determine petitioner failed to make a

reasonable attempt to comply with provisions of the internal revenue laws or

disregarded rules or regulations by acting carelessly, recklessly, or with intentional

disregard. Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs. Only one

accuracy-related penalty may be imposed for a given portion of an underpayment

even though that portion implicates more than one form of misconduct described in

section 6662. Sec. 1.6662-2(c), Income Tax Regs. Because respondent has carried

his burden under section 7491(c) to show that the inappropriately claimed bad debt

deduction resulted in a substantial understatement of petitioner's income tax,[14] we

need not decide whether petitioner would also be liable for the penalty by reason of

negligence or reckless disregard of rules and regulations.

Once respondent has proved his prima facie case for imposing the penalty

under section 6662(a), petitioner bears the burden of proving that the penalty is

unwarranted by establishing an affirmative defense such as reasonable cause or

---

[14]The correct tax required to be shown on petitioner's return was $174,880. The understatement of tax due from petitioner for 2006 is $88,769. Ten percent of the correct tax liability for 2006 is $17,488. Thus, petitioner substantially understated his 2006 income tax liability.

[*25] substantial authority. See sec. 6664(c)(1); sec. 6662(d)(2)(B). Again, petitioner did not make any arguments on brief to establish that his claim of the bad debt deduction was based on reasonable cause or substantial authority. Thus, we conclude that petitioner has abandoned the argument. See Zapara v. Commissioner, 124 T.C. at 233; see also Higbee v. Commissioner, 116 T.C. at 446-447.

In any event, the record does not show the substantial authority defense is available to petitioner, who has not otherwise cited any authority, not to mention substantial authority, to support his worthlessness claim. Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the challenged item. See United States v. Boyle, 469 U.S. 241 (1985). A taxpayer's reliance on the advice of a professional, such as a certified public accountant, may constitute reasonable cause and good faith if the taxpayer could prove by a preponderance of the evidence that: (1) the taxpayer reasonably believed the professional was a competent tax adviser with sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the advising professional; (3) the taxpayer actually relied in good faith on the professional's advice. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C.

**[*26]** 43, 98-99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also sec. 1.6664-4(c)(1), Income Tax Regs.

It is apparent from the record that petitioner did not provide all the necessary and accurate information to Mr. Epperson for him to determine whether the Landmark note was worthless in 2006. Mr. Epperson only reviewed the Landmark note and the PMB note in addition to IRS publications and some unnamed court cases. Petitioner did not provide Mr. Epperson the Landmark financial records that formed the basis of his worthlessness claim. Nor did petitioner take Mr. Epperson with him to Landmark's office to review the company's financial records. Thus, even if petitioner had relied in good faith on Mr. Epperson's advice, Mr. Epperson's determination that the Landmark note was worthless rings hollow and cannot form the predicate for the reasonable cause defense.

We have considered all of petitioner's arguments for a contrary holding, and to the extent not discussed herein we conclude they are irrelevant, moot, or lacking in merit.

To reflect the foregoing,

Decision will be entered for

respondent.